

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

OCT 0 3 2006

BROOKLYN OFFICE

| | |
|---|---|
| RANDALL W. CLARK, On Behalf of Himself and All Others Similarly Situated, | : Civil Action No.: |
| Plaintiff, | : |
| v. | : **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE** |
| HOME DEPOT, INC., ROBERT L. NARDELLI, JOHN I. CLENDENIN, MILLEDGE A. HART III, KENNETH G. LANGONE, GREGORY D. BRENNEMAN, CLAUDIO X. GONZALEZ, THOMAS J. RIDGE, BONNIE G. HILL, RICHARD H. BROWN, LAWRENCE R. JOHNSTON, CAROL B. TOME, BERRY R. COX, LARRY M. MERCER, HOME DEPOT FUTUREBUILDER ADMINISTRATIVE COMMITTEE, ILEANA L. CONNALLY, and JOHN DOES 1-20, | : **EMPLOYER RETIREMENT** : **INCOME SECURITY ACT** : : : SIFTON, J. : : : : MANN, M.J. |
| Defendants. | : |

Plaintiff, a participant in the Home Depot, Inc. ("Home Depot" or the "Company")

FutureBuilder defined contribution plan (the "Plan")[1], on behalf of himself and a class of all others

similarly situated (the "Participants"), alleges as follows:

## INTRODUCTION

1.     This is a class action brought pursuant to § 502 of the Employee Retirement Income

Security Act ("ERISA"), 29 U.S.C. § 1132, against the Plan fiduciaries, including Home Depot.

2.     Employee 401(k) plans confer tax benefits on participating employees to incentivize

saving for retirement and/or other long-term goals.  Employees participating in a 401(k) plan may

---

[1]     Plaintiff also brings this action on behalf of participants in the Home Depot FutureBuilder for Puerto Rico and The Maintenance Warehouse FutureBuilder plan.

have the option of purchasing the common stock of, or other investment options created by, their employer, often the sponsor of the plan, for part of their retirement investment portfolios. Company stock is an investment alternative in the Plan.

3.     Plaintiff was an employee of Home Depot and a participant in the Plan during the Class Period. Plaintiff's retirement investment portfolio included Home Depot stock during the Class Period.

4.     The Plan has two main components: (i) a component in which plan participants make voluntary, pretax contributions to the Plan out of their base pay (the "Participant Contribution Component"), and (ii) a component in which the Company matches a portion of the participant's contribution to the Plan (the "Company Contribution Component").

5.     Throughout the Class Period (as defined below), the Plan invested primarily in Home Depot common stock ("Home Depot Stock" or "Company Stock"), which was offered as one of the investment alternatives in the Participant Contribution Component of the Plan. In addition, at various times during the Class Period, a Company Contribution Component of the Plan was invested in Home Depot Stock.

6.     Plaintiff's claims arise from the failure of Defendants, who are Plan fiduciaries, to act solely in the interest of the participants and beneficiaries of the Plan, and to exercise the required skill, care, prudence, and diligence in administering the Plan and the Plan's assets during the Class Period, as is required by ERISA.

7.     Plaintiff alleges that Defendants, as fiduciaries of the Plan, breached their duties to Plaintiff and to the other Participants and beneficiaries of the Plan in violation of ERISA, particularly with regard to the Plan's holdings of Home Depot Stock.

2

8.      During the Class Period, as described herein, Defendants knew or should have known that Home Depot stock was an imprudent investment alternative for the Plan due to the rampant business improprieties occurring at the Company.   Upon information and belief, certain defendants played an active role in implementing the business improprieties described herein to artificially inflate the value of Company stock during the Class Period.

9.      Defendants are liable under ERISA to restore losses sustained by the Plan as a result of their breaching of their fiduciary obligations.

## JURISDICTION AND VENUE

10.     **Subject Matter Jurisdiction**: This is a civil enforcement action for breach of fiduciary duty brought pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a).   This Court has original, exclusive subject matter jurisdiction over this action pursuant to the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).   In addition, this Court has subject matter jurisdiction pursuant to the general jurisdictional statute for "civil actions arising under the . . . laws . . . of the United States." 28 U.S.C. § 1331.

11.     **Personal Jurisdiction**: ERISA provides for nation-wide service of process, ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).   All of the Defendants are residents of the United States and this Court therefore has personal jurisdiction over them.   This Court also has personal jurisdiction over them pursuant to Fed. R. Civ. P. 4(k)(1)(A) because they all would be subject to the jurisdiction of a court of general jurisdiction in the State of New York.

12.     **Venue**: Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1 132(e)(2), because the Plan was administered in this district, and some or all of the fiduciary breaches for which relief is sought occurred in this district.   In addition, regulators in this district

3

have requested records from many companies, and/or are investigating many companies, in connection with the inappropriate backdating of executive stock options, a practice allegedly engaged in by the Company as alleged herein.

## PARTIES

13.     Plaintiff Randall W. Clark was an Home Depot employee, a participant in the Plan pursuant to § 3(7) of ERISA, 29 U.S.C. § 1102(7), and held Home Depot stock in his retirement investment portfolio during the Class Period.

14.     Defendant Home Depot operates as a home improvement retailer.  Home Depot claims to be the world's largest home improvement retailer and the second largest retailer in the United States.  Home Depot's stores offer a wide assortment of building materials, home improvement wares, lawn and garden products and provide a number of home improvement-related materials and services, including building materials, lumber and millwork, plumbing, electrical and kitchen hardware and seasonal materials, paint, flooring, wall covering products and generators, as well as furnace and central air systems.  Home Depot also provides installation services for such jobs as carpeting, flooring, cabinetry, counter tops and water heaters.  As of June 2006, Home Depot operated over 2,000 stores located throughout the United States, including the territories of Puerto Rico and the Virgin Islands, as well as in 10 Canadian provinces and Mexico.  In addition, Home Depot maintains a retail store format that sells products and services primarily for home decorating and remodeling projects called EXPO Design Center, and two retail store formats focused on professional customers called Home Depot Supply and The Home Depot Landscape Supply.

15.     Defendant Robert L. Nardelli ("Nardelli") served as Chairman of Home Depot's Board of Directors during the Class Period.  Defendant Nardelli also served as Chief Executive

4

Officer and President during the Class Period. Nardelli was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Nardelli was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

16.    Defendant John L. Clendenin ("Clendenin") has served as a Board member since 1997. Clendenin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Clendenin was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

17.    Defendant Milledge A. Hart III ("Hart") has served as a Board member since 1978. Hart was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Hart was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

18.    Defendant Kenneth G. Langone ("Langone") has served as a Board member since 1978. Langone was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or

management and disposition of the Plan's assets. Upon information and belief, Langone was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

19.    Defendant Gregory D. Brenneman ("Brenneman") has served as a Board member since 2000. Brenneman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Brenneman was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

20.    Defendant Claudio X. Gonzalez ("Gonzalez") has served as a Board member since 2001. Gonzalez was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Gonzalez was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

21.    Defendant Thomas J. Ridge ("Ridge") has served as a Board member since 2005. Ridge was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Ridge was a fiduciary of the Plan

within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

22.     Defendant Bonnie G. Hill ("Hill") has served as Board member since 1999. Hill was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Hill was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

23.     Defendant Richard H. Brown ("Brown") is a Board member not standing for re-election. Brown was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Brown was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

24.     Defendant Lawrence R. Johnston ("Johnston") has served as a Board member since 2004. Johnston was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Johnston was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with

7

respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

25.   Defendant Carol B. Tome ("Tome") served as Executive Vice President and Chief Financial Officer during the Class Period. Tome was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Tome was a fiduciary of the Plan within the meaning of ERISA in that she exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

26.   Defendant Larry M. Mercer ("Mercer") served as Executive Vice President of Home Depot's Store Operations during the Class Period, until his retirement during the second half of 2002. Defendant Mercer was responsible for operations at the Company's retail locations and according to press accounts after his retirement, also served as an advisor to Defendant Nardelli until February 2004.   Mercer was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets. Upon information and belief, Mercer was a fiduciary of the Plan within the meaning of ERISA in that he exercised discretionary authority with respect to: (i) management and administration of the Plan; and/or (ii) management and disposition of the Plan's assets.

27.   Defendant Home Depot FutureBuilder Administrative Committee ("Committee Defendants"). The Defendants appointed a committee of various officers and employees to sit on a Committee that managed the operation and administration of the Plan. These Committee

8

Defendants exercised discretionary authority and discretionary control with respect to the management of the Plan, they possessed discretionary authority or discretionary responsibility in the administration of the Plan, and they exercised authority or control with respect to the management of the Plan's assets.

28.     Defendant Ileana I. Connally ("Connally") served as a member of the Home Depot FutureBuilder Administrative Committee during the Class Period.  As a member of this Committee, Defendant Connally exercised discretionary authority and discretionary control with respect to the management of the Plan, possessed discretionary authority or discretionary responsibility in the administration of the Plan, and exercised authority or control with respect to the management of the Plan's assets.

29.     Home Depot is a fiduciary of the Plan within the meaning of ERISA.  Home Depot exercises discretionary authority with respect to management and administration of the Plan and/or management and disposition of the Plan's assets.  Home Depot at all times acted through its officers and employees, including its Chief Executive Officer ("CEO") and members of its Board oversight to perform Home Depot's Plan-related fiduciary functions in the course and scope of their employment.

30.     Home Depot had, at all applicable times, effective control over the activities of its officers and employees, including over their Home Depot Plan-related activities.  Home Depot, through its Board of Directors, Executive Officers, or otherwise, had the authority and discretion to hire and terminate said officers and employees.  Home Depot, through its Board and otherwise, also had the authority and discretion to appoint, monitor, and remove Directors, Officers and other employees from their individual fiduciary roles with respect to the Plan.  By failing to properly

9

discharge their fiduciary duties under ERISA, such Defendant-fiduciaries breached duties they owed to Participants in the Plan and their beneficiaries. Accordingly, the actions of these fiduciaries are imputed to Home Depot under the doctrine of *respondent superior*, and Home Depot is liable for such actions.

### Unknown Fiduciaries

31.     There are fiduciaries of the Plan whose identities are currently unknown to Plaintiff. Once their identities are ascertained, Plaintiff will seek leave to join them under their true names.

32.     Defendants include named and *de facto* fiduciaries with respect to the Plan. All Defendants exercised discretionary authority or control regarding management of the Plan, management of the Plan's assets, and/or administration of the Plan.

### THE PLAN

33.     The Plan is an "employee pension benefit plan," as defined by §§ 3(3) and 3(2)(A) of ERISA, 29 U.S.C. § 1002(3) and 1002(2)(A). The Plan is a legal entity which can sue or be sued. ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(l). However, in a breach of fiduciary duty action such as this, the Plan is neither a plaintiff nor a defendant. Rather, pursuant to ERISA § 409, 29 U.S.C. § 1109, and the law interpreting it, the relief requested in this action is for the benefit of the Plan. Stated differently, in this action, Plaintiff, who is described above, seeks relief on behalf of the Plan.

34.     The Form 11-K Annual Report of the Plan for the fiscal year ended December 31, 2005, which was filed with the Securities and Exchange Commission in June 29, 2006 states, among other things:

### *Description of the Plan*

10

The following is a brief description of The Home Depot FutureBuilder (the "Plan"). Participants should refer to the summary plan description for a more complete description of the Plan's provisions.

### (a)    General

The Plan is a defined contribution plan covering substantially all U.S. associates of The Home Depot, Inc. and subsidiaries (the "Company"). Associates are eligible to participate in the Plan for purposes of making elective deferrals after completing 90 days of service. Participants are eligible for the Company's matching contributions on the first day of the calendar quarter (January 1, April 1, July 1, and October 1) coincident with or following the completion of 12 months of service and 1,000 hours. Temporary associates and certain THD At-Home Services, Inc. 100% commission associates are eligible to make before-tax contributions following the completion of 12 months of service and 1,000 hours. The Plan excludes leased associates, nonresident aliens, and associates covered by a collective bargaining agreement, unless the terms of the collective bargaining agreement require that the associate be eligible to participate in the Plan. The Plan is subject to certain provisions of the Employee Retirement Income Security Act of 1974 ("ERISA"). The Plan is administered by the Administrative Committee made up of associates of Home Depot U.S.A., Inc.

Effective July 1, 2004, the Maintenance Warehouse FutureBuilder was merged with and into the Plan, at which time all participants in the Maintenance Warehouse FutureBuilder became participants in the Plan. Accordingly, net assets of $20,246,001 were transferred into the Plan.

### (b)    Contributions

Under the 401(k) portion of the Plan, participants may contribute up to 50% of annual compensation on a pretax basis, as defined in the Plan, subject to regulatory limitations. Participants may also contribute amounts representing eligible rollover distributions from other qualified retirement plans. The Company provides matching contributions of 150% of the first 1% of eligible compensation

11

contributed by a participant and 50% of the next 2% to 5% of eligible compensation contributed by a participant beginning on the first day of the calendar quarter following the completion of 12 months of service and 1,000 hours. THD At-Home Services 100% commission associates are not eligible to receive matching contributions. Associates of Williams Bros. Lumber Company, LLC ("Williams Bros.") are eligible for matching contributions of 25% of the first 6% of compensation contributed by a participant. Additional amounts may be contributed at the option of the Company's board of directors. Effective April 15, 2005, the default for the Company's matching contribution if no direction is given, is the participant's current investment election with respect to elective contributions. If the participant has made no affirmative investment election with respect to elective contributions, the default is the INVESCO Stable Value Trust.

Certain former participants of the Maintenance Warehouse FutureBuilder are eligible for supplemental annual matching contributions. Eligible associates employed on or before July 1, 1999 who are actively employed by The Home Depot Supply, Inc. at December 31 of each calendar year receive a matching contribution equal to 4.5% of annual compensation. Additionally, eligible associates of The Home Depot Supply, Inc. employed on or before July 1, 2004 who are actively employed by The Home Depot Supply, Inc. at December 31 of each calendar year receive a matching contribution equal to 2.5% of annual compensation. Participants must continually contribute at least 3% of compensation to the Plan in order to remain eligible for the supplemental annual matching contributions. Participants designated by the Company as highly compensated associates are not eligible to receive the supplemental annual matching contributions.

Employee stock ownership contributions were made solely by the Company and at the discretion of the Company's board of directors ("ESOP contributions"). The Company made its last ESOP contribution in February 1999.

### (c)    Participant Accounts

The Plan maintains a separate account for each participant, to which contributions and investment performance are allocated.

12

## THE DEFENDANTS' FIDUCIARY STATUS

35.     During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plan and/or the management or disposition of the Plan's assets.

36.     During the Class Period, Defendants acted as fiduciaries of the Plan pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

37.     Instead of delegating all fiduciary responsibility for the Plan to external service providers, Home Depot chose to internalize its respective fiduciary functions.

## CLASS ACTION ALLEGATIONS

38.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and the following class of persons similarly situated (the "Class"):

> All persons who were participants in or beneficiaries of the Plan at any time between June 30, 2001 through the present (the "Class Period") and whose accounts held Company stock.

39.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertained through appropriate discovery, Plaintiff believes there are, at a minimum thousands of members of the Class who participated in, or were beneficiaries of the Plan during the Class Period.

40.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants each owed a fiduciary duty to Plaintiff and members of the Class;

(b)    whether Defendants breached their fiduciary duties to Plaintiff and members of the Class by failing to act prudently and solely in the interests of the Plan's Participants and beneficiaries; and

(c)    whether Defendants violated ERISA.

41.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and the other members of the Class each sustained similar harm arising out of the Defendants' wrongful conduct in violation of federal law as complained of herein.

42.    Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action, ERISA, and complex civil and commercial litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

43.    Class action status in this ERISA action is warranted under Rule 23(b)(l)(B) because prosecution of separate actions by the members or the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical manner, be dispositive of the interests of the other members of the Class parties to the actions, or substantially impair or impede their ability to protect their interests.

44.    Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole; and (iii)

14

questions of law or fact common to members of the Class predominate over any questions affecting only individual members and a class action is superior to the other available methods for the fair and efficient adjudication of this controversy.

## SUBSTANTIVE ALLEGATIONS

### Home Depot Stock Was an Imprudent Investment for the Plan

45.     During the Class Period, Defendants ignored several serious, non-public red flags that should have alerted them to the fact that Home Depot Stock was not a prudent investment for the Plan. Moreover, Defendants knew or should have known that Home Depot's business was not performing nearly as well as had previously been represented to the investing public and to Plan participants and beneficiaries. Defendants also failed to investigate the questionable business and financial reporting practices that the Company engaged in during the Class Period.

### A.     Defendants' Illegal Option Backdating Scheme

46.     On June 16, 2006, Home Depot announced that its top executives had improperly backdated their stock option grants in at least five instances prior to December 2001. This announcement came on the heels of an in-depth report into option granting practices that appeared in The Wall Street Journal. This report revealed that top executives at numerous companies were backdating their options in violation of the Company's own option granting practices. Backdating occurs when executives backdate their options to an earlier, more advantageous price -- rather than paying the market price for the option on the day it is issued. Arthur Levitt, former head of the SEC, has stated that backdating "represents the ultimate in greed. It is stealing, in effect. It is ripping o n shareholders in an unconsciousable way."

15

47.    Backdating stock option grants to obtain beneficial exercise prices is akin to picking lottery numbers on the day after the winning numbers are reported in the news. It is a reckless and unlawful exercise that unjustly appropriates corporation assets and benefits. Accordingly, all of the now unexercised options should be immediately cancelled and all of the financial gains to the recipients who exercised such options should be returned to the Company. Further, the Company's directors who administered and determined to grant these options utterly failed to fulfill their fiduciary duties to the Company and they, too, are accountable for that failure.

48.    Since at least December 2001, Home Depot, through the actions of its Board of Directors and its Compensation Committee, has granted stock options for the purchase of millions of shares of the Company's common stock to its top executives, including many of its current and/or former directors and senior officers named as Defendants herein.

49.    A stock option is a right to purchase a particular stock at a fixed price, called the "exercise" or "strike" price. When the stock's market price exceeds the strike price, the option holder may purchase the stock at the exercise price and resell it at the high market price, pocketing the difference. The lower the strike price of the option, the larger the sum obtained when the option is exercised.

50.    At all relevant times, stock option grants to the Defendants were required to carry a strike price not less than the publicly traded closing price of the stock on the date of grant. All executive compensation stock options to the Defendants during the relevant period were issued pursuant to the Home Depot Stock Option Plan.

51.    It is now evident that the Defendants did not comply with the requirement that stock options granted to the Defendants be priced on the date of grant or issuance. The multi-year pattern

of stock option grants on dates with highly favorable exercise prices – invariably at historic stock price lows or right before a large stock price run-up – indicates that the purported grant dates of the stock options were not the actual dates on which the option grants were made. Rather, the pattern indicates that grants to executives were repeatedly backdated to dates with exceedingly low stock prices.

52.     Contrary to the Company's public disclosures, the options granted under the Plan were highly favorable to the option recipients because the stock options were not granted at the "fair market value" on the date of grant but were in fact back dated.   In many instances, the grant dates were allegedly dated just before a sharp increase in the trading price of Home Depot Stock or at the bottom of a steep drop in the stock's price.

53.     The practice of backdating options at Home Depot, and many other companies, commenced prior to the passage of the Sarbanes-Oxley Act of 2002 ("Sarbanes") on July 30, 2002, when option grants did not have to be reported to the SEC until 45 days after the close of the fiscal year in which the options were granted.   Sarbanes amended a section of the Exchange Act and required insiders to file notification of grants within two business days of their receipt.

54.     Defendants took advantage of the pre-Sarbanes rules to perpetrate their scheme. Prior to Sarbanes, Defendant Nardelli in particular caused and received several grants at lows in the Company's stock chart.   As a result of the backdating of stock options issued to Defendants, they have been unjustly enriched at the expense of Home Depot, which has received and will receive less money from Defendants when they exercise their options at prices substantially lower than they would have if the options had not been backdated.   These windfall profits have made Defendant Nardelli, as well as the other Defendants, some of the highest paid executives in their industry.

17

55.    The Defendants purportedly received grants of stock options from the Company on unusually favorable dates over the past several years.   These stock options were claimed to have been granted at or near the stock's annual low, or immediately after a substantial dip in the stock price followed by a substantial run-up.   Analysis of this seemingly fortuitous pattern of stock option grants reveals that the pattern could not have resulted innocently.   Rather, the only possible explanation is that these stock option grants were, in fact, backdated to allow the options' recipients to enjoy the largest possible returns at the expense of the Company.

56.    The backdating of stock option grants and the issuance of these options in the amounts awarded to the Defendants caused, and continues to cause, substantial harm to the Company.   Backdating stock option grants represents a direct and continuing waste of valuable corporate assets.   Home Depot is the counter party to the option contracts with its executives, and the proceeds obtained, and yet to be obtained, by these executives through exercising their backdated stock options are therefore siphoned, on a dollar for dollar basis, directly from Home Depot.   In effect, the backdated grants gave the Defendants an option to purchase Home Depot shares directly from the Company at an unfair and improperly low price, with the Company making up the difference

57.    The practice of backdating stock options also substantially harmed, and continues to harm, Home Depot by virtue of the fact that the practice is unlawful, deceitful, and caused the Company to misreport its financial data.   Under the relevant accounting rules, options priced below the stock's fair market value upon award are considered compensation and must, therefore, be treated by the Company as an expense directly impacting earnings.   Upon information and belief, Home Depot did not properly expense this compensation to the Defendants even though the backdated

18

stock options at issue in this action were priced below the fair market value of the Company's stock at the date of grant and issuance.

58.   Further, the option backdating likely caused Home Depot to violate the Internal Revenue Code.  Indeed, compensation from exercised stock options issued under the backdating scheme that was previously deducted, was in fact, nondeductible under Section 162(m) of the Internal Revenue Code.  Accordingly, the Company will likely be required to pay additional taxes and interest associated with deductions it previously took for compensation associated with such exercised stock options.

59.   Backdating stock options also severely undermines the already grossly excessive incentives that purportedly justified the use of stock options to compensate Home Depot's management. Stock option compensation is intended to encourage management to maximize- the return to shareholders by aligning the interests of management with those of shareholders.  In contrast, by permitting Defendants to receive stock option grants backdated to correspond to low points in the stock price, Defendants created an absurd incentive for management to engineer dips and volatile swing in the stock price. Further, the size and terms of the grants were so excessive that they incentivized management to retire rather than work.

60.   Issuing backdated stock options is unlawful, ultra vires and outside the scope of legitimate and permissible business conduct. The practice is inherently manipulative and involves a substantial likelihood that business records were intentionally falsified.

61.   Defendants, who were and/or are directors and/or officers of Home Depot, with a fiduciary duty to act with the utmost good faith and loyalty, either expressly authorised the practice

of backdating stock options or, in conscious disregard of their fiduciary duties, made no effort to seek recompense to the Company.

**B.      Defendants' Other False and Misleading Statements and Omissions**

62.      Defendants made other false and misleading statements to Plan participants about Home Depot Stock. On May 29, 2001, Home Depot filed a Form 10-Q for quarter ending April 29, 2001. The filing, signed by Defendants Nardelli and Tome, reported an increase in net sales of 9.8%, to $12.2 billion. Defendants also reported that the increase in sales was partially offset by a 3% decline in comparable store-for-store sales, that gross profit as a percent of sales was 30.0% and that diluted earnings per share for the quarter were $0.27

63.      On August 27, 2001, Home Depot filed with the SEC Form 10-Q for the quarter ending July 29, 2001. The filing, signed by Defendants Nardelli and Tome, reported an increase in net sales of 15.5%, to $14.6 billion. Defendants also reported that comparable store-for-store sales had increased 1%, that gross profit as a percent of sales for the quarter and first six months of the fiscal year were 29.7% and 29.8%, respectively. Defendants also reported that net earnings as a percent of sales for the quarter and first six months of the fiscal year were 4.3% and 5.8%, respectively. Finally, Defendants reported that diluted earnings per share for the quarter and first six months of the fiscal year were $0.39 and $0.66, respectively.

64.      On November 28, 2001, Home Depot filed with the SEC Form 10-Q for the quarter ending October 28, 2001. The filing, signed by Defendants Nardelli and Tome, reported that net sales for the quarter increased 15.1 % to $13.3 billion. Defendants also reported that, for the first nine months of the fiscal year, net sales increased 13.6%, to $40.1. billion. Defendants also reported that comparable store-for-store sales were flat for the quarter of fiscal 2001, while gross profit as a

percent of sales for the quarter was 30.2%. Finally, Defendants reported that diluted earnings per share for the quarter and for the first nine months of the fiscal year were $0.33 and $0.99, respectively.

65.     On April 19, 2002, Home Depot filed with the SEC Form 10-K for the year ending February 3, 2002. The filing, signed by Defendants Nardelli, Tome, Langone, Cox and Clendenin, by themselves or "pursuant to powers of attorney," reported an annual increase in net sales of 17.1%, to $53.6 billion. Defendants reported flat comparable store-for-store sales, gross profits as a percent of sales of 3.2%, net earnings as a percent of sales of 5.7% and diluted earnings per share of $1.29.

66.     On April 21, 2003, Home Depot filed with the SEC Form 10-K for the year ending February 2, 2003. The filing, signed by Defendants Nardelli, Tome, Langone, Cox, and Clendenin, including certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, reported an increase in net sales of 8.8% to $58.2 billion, flat comparable store-for-store sales and increased gross profits as a percent of sales of 31.1 %. Defendants also certified and concluded that the Company maintained "effective" disclosure controls and procedures.

67.     On April 12, 2004, Home Depot filed SEC Form 10-K for the year ending February 1, 2004. The filing, signed by Defendants Nardelli, Tome, Langone, Cox, and Clendenin, including certifications pursuant to Section 302 of the Sarbanes-Oxley Act of 2002, reported increased net sales for fiscal 2003 of 11.3% to $64.8 billion, increased net earnings of $4.3 billion and diluted earnings per share of $1.88. Defendants also certified and concluded that the Company maintained "effective" disclosure controls and procedures.

68.     On December 2, 2004, Home Depot filed with the SEC Form 10-Q for the quarter

ending October 31, 2004.  The filing, signed and certified by Defendants Nardelli and Tome,

reported increased net sales of 13.1%, or $18.8 billion.  The filing also reported increased sales of

1.3.3%, to $56.3 billion, for the first nine months of the 2004 fiscal year, increased gross profits of

20.4% to $6.3 billion, and 19.5%, to $18.7 billion, for the quarter and for the first nine months of

fiscal 2004, respectively.  Defendants also reported diluted earnings per share of $0.60 and $1.78 for

the third quarter and first nine months of fiscal 2004, respectively.

69.     Defendants' statements and certifications as contained in the paragraphs above were

erroneous, false and misleading.  In fact, Defendants misrepresented or omitted material adverse

facts, including that: (a) during 2001-2004, the Company engaged in a scheme to inflate Company

earnings through its "RTV" policies and practices; (b) during 2001-2004, the Company reported

revenues and profits which were materially inflated as a result of its "RTV" policies and practices;

(c) the Company employed flawed and defective internal controls and procedures, resulting in

inaccurate, false and misleading financial statements; (d) the Company engaged in multiple

violations of its own ethical code of conduct; and (c) the investment community would be unable

to accurately assess the Company's business prospects and consequences resulting from Defendants'

conduct, including the potential for regulatory action and fines.

### THE TRUTH IS REVEALED

70.     During the fourth quarter of 2004, Defendants became aware of reports that Home

Depot store employees were planning to publicize details of Defendants' RTV scheme.  As a result,

Defendants sought to gradually unwind their practices.  On February 22, 2005, Defendants issued

a press release, reporting a quarterly net profit of $1.04 billion, meeting analysts' projections of

cents per share. However, Defendants shocked the market by "revealing" that revenue and EBIT growth during 4Q:04 had fallen dramatically and inexplicably short of prior growth targets.

71.     As a result of the news of February 22, 2005, the price of Home Depot shares staged a dramatic decline. At the close of trading on February 18, 2005, the price of the Company's stock was $42.02 per share. However, on April 28, 2005, Home Depot's shares had achieved a low of $35.09 per share, a decline of over 16%, resulting in a loss in market capitalization of over $16.5 billion.

72.     Since August 2005, several news articles reported that Home Depot had defrauded its vendors, inflating what it charged them to cover the cost of merchandise found to be defective or damaged. The SEC probe appears to be focused upon the fact that the practices described by Home Depot employees (both present and former) occurred throughout the country.

73.     Throughout the Class Period, the price of the Company's stock was artificially inflated as a direct result of Defendants' long-standing scheme to misrepresent the Company's financial condition and results. Had Defendants revealed the truth about the Company's financial condition and results to the investment community, Plaintiff and the other Class members would not have purchased Home Depot Stock or would have purchased shares at substantially lower prices.

74.     During the Class Period, Home Depot concealed its violations of Generally Accepted Accounting Principles ("GAAP") and SEC rules by failing to properly implement and oversee the Company's internal controls, processes and procedures over its accounting functions and attend to the proper training of its staff involved with the Company's accounting and financial reporting activities.

23

75.     The financial statements issued during the Class Period and the statements about them were false and misleading, as such financial information was not prepared in conformity with GAAP or SEC guidelines, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting in violation of GAAP and SEC rules.

76.     GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time.  Regulation S-X (17 C.F.R.  § 210.4-01 (a)(l)) states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. § 210.10-01 (a).

77.     Due to these accounting improprieties, the Company presented its financial results and statements in a manner which violated GAAP, including the following fundamental accounting principles:

(a)     The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements was violated (APB No. 28, ¶ 10);

(b)     The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions was violated (FASB Statement of Concepts No. 1, ¶ 34);

(c)     The principle that financial reporting should provide information about the

economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources was violated (FASB Statement Concepts No. 1, ¶ 40);

(d)      The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it was violated.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶ 50);

(e)      The principle that financial reporting should provide information about an enterprise's financial performance during a period was violated.  Investors and creditors often use information about the past to help in assessing the prospects of an enterprise.  Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance (FASB Statement Concepts No. 1, ¶ 42);

(f)      The principle that financial reporting should be reliable in that it represents what it purports to represent was violated.  That information should be reliable as well as relevant is a notion that is central to accounting (FASB Statement of Concepts No. 2, ¶¶ 58-59);

(g)      The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions was violated (FASB Statement of Concepts No. 2, ¶ 79); and

(h)      The principle that conservatism be used as a prudent reaction to

uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered was violated.  The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶ 95,97).

78.     Further, the undisclosed adverse information concealed by Defendants during the Class Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## DEFENDANTS KNEW OR SHOULD HAVE KNOWN THAT
## HOME DEPOT STOCK WAS NOT A PRUDENT PLAN INVESTMENT

79.     At all relevant times, Defendants knew or should have known that Home Depot was engaged in the questionable business practices detailed above which made Home Depot Stock an imprudent Plan investment.

80.     Home Depot, the Committee Defendants and Defendants failed properly to take into account the numerous practices that put Home Depot Stock at risk as well as the fact that Home Depot Stock was inflated in value when determining the prudence of investing and holding Plan assets in Home Depot Stock.

81.     As a result of Defendants, knowledge of and, at times, implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any generalized warnings of market and diversification at Home Depot made to Plan Participants did not effectively inform Plan Participants of the past, immediate, and future dangers of investing in Company Stock.

26

82.     In addition, named and unnamed Defendants, as fiduciaries responsible for monitoring the investment of Plan assets, failed to adequately review the performance of the Committees to ensure that they were fulfilling their fiduciary duties under the Plan and ERISA.

83.     The Company, the Committee Defendants and other individual Plan fiduciary delegates failed to conduct an appropriate investigation into whether Home Depot Stock was a prudent investment for the Plan and, in connection therewith, failed to provide the Plan Participants with information regarding Home Depot's improper activities so that Participants could make informed decisions regarding Home Depot Stock in the Plan, or otherwise failed to protect the Plan and its Participants against inevitable losses.

84.     Defendant Nardelli's failure in this regard is particularly acute. As a result of his role as Home Depot's CEO, Nardelli knew or should have known of the Company's improper practices. Yet, upon information and belief, despite his obligation to properly and materially inform Participants in the Plan of the true risks involved with holding Home Depot Stock, he remained silent.

85.     An adequate investigation by Defendants would have revealed to a reasonable fiduciary that investment by the Plan in Home Depot Stock offered by the Plan, under these circumstances, was imprudent. A prudent fiduciary acting under similar circumstances would have acted to protect Participants against unnecessary losses, and would have made a different investment decision.

86.     Because Defendants knew or should have known that Company stock was not a prudent investment option for the Plan, they had an obligation to protect the Plan and its Participants

27

from unreasonable and entirely predictable losses incurred as a result of the Plan's investment in Company stock.

87.     Defendants had available to them several different options for satisfying this duty, including: making appropriate public disclosures as necessary; divesting the Plan of Company stock; consulting independent fiduciaries regarding appropriate measures to take in order to prudently and loyally serve the Participants of the Plan; or resigning as fiduciaries of the Plan to the extent that as a result of their employment by the Company they could not loyally serve Participants in the Plan in connection with the Plan's acquisition and holding of Company stock.

88.     Despite the availability of these and other options, Defendants failed to take any action to protect Participants from losses as a result of Plan investment in Home Depot Stock.

### DEFENDANTS REGULARLY COMMUNICATED WITH PARTICIPANTS IN THE PLAN CONCERNING HOME DEPOT STOCK OFFERED BY THE PLAN, YET FAILED TO DISCLOSE THE IMPRUDENCE OF INVESTMENT IN COMPANY STOCK

89.     Upon information and belief, the Company regularly communicated with employees, including Participants in the Plan, about the performance, future financial and business prospects of the Company's common stock.  During the Class Period, the Company fostered a positive attitude toward the Company's stock and/or allowed Participants in the Plan to follow their natural bias towards investment in the equities of their employer by not disclosing negative material information concerning investment in the Company's stock.  As such, Participants in the Plan could not appreciate the true risks presented by investments in the Company's stock and therefore could not make informed decisions regarding their investments in the Plan.

28

90.     As noted above, these SEC filings and related Company statements and releases were

inaccurate, incomplete and materially misleading, causing Plan Participants to purchase and to hold

and maintain, Plan investments in Home Depot Stock.

91.     The Company, the Committee Defendants and or the Plan's individual fiduciary

delegates failed to provide Plan Participants with complete and accurate information regarding Home

Depot Stock, such that the Participants could appreciate the true risks presented by investments in

Home Depot Stock and could make informed decisions regarding investments in the Plan.

## CLAIMS FOR RELIEF UNDER ERISA

92.     At all relevant times, Defendants were and acted as fiduciaries within the meaning

of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

93.     ERISA § 502, 29 U.S.C. § 1132, provides, in pertinent part, that a civil action may

be brought by a participant for relief under ERISA § 409, 29 U.S.C. § 1109.

94.     ERISA § 409(a), 29 U.S.C. § 1109(a), "Liability for Breach of Fiduciary Duty,"

provides, in pertinent part, that any person who is a fiduciary with respect to a plan who breaches

any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be

personally liable to make good to such plan any losses to the plan resulting from each such breach,

and to restore to such plan any profits of such fiduciary which have been made through use of assets

of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court

may deem appropriate, including removal of such fiduciary.

95.     ERISA § 404(a)(l)(A) and (B), 29 U.S.C. § 1104(a)(l)(A) and (B), provides, in

pertinent part, that a fiduciary shall discharge his duties with respect to a plan solely in the interest

of the Participants and beneficiaries, for the exclusive purpose of providing benefits to Participants

and their beneficiaries, aid with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

96.     These fiduciary duties under ERISA § 404(a)(l)(A) and (B) are referred to as the duties of loyalty, exclusive purpose and prudence and are the "highest known to the law." They entail, among other things,

(a)     The duty to conduct an independent and thorough investigation into, and continually to monitor, the merits of all the investment alternatives of a plan, including in this instance Company stock, to ensure that each investment is a suitable option for the plan; and

(b)     A duty to disclose and inform, which encompasses: (i) a negative duty not to misinform; (ii) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and (iii) a duty to convey complete and accurate information material to the circumstances of Participants and beneficiaries.

97.     ERISA § 405(a), 29 U.S.C. § 1105(a), "Liability for breach by co-fiduciary," provides, in pertinent part, that:

> ". . . in addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances: (A) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (B) if, by his failure to comply with section 404(a)(8), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or (C) if he has knowledge of a breach by such other fiduciary, unless be makes reasonable efforts under the circumstances to remedy the breach."

30

98.     Plaintiff therefore brings this action under the authority of ERISA § 502 for Plan-wide relief pursuant to ERISA § 409(a) to recover losses sustained by the Plan arising out of the breaches of fiduciary duties by the Defendants.

## COUNT I

## FAILURE TO PRUDENTLY AND LOYALLY MANAGE PLAN ASSETS (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404)

99.     Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

100.    At all relevant times, as alleged above, the Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

101.    As alleged above, the Defendants were all responsible in different ways and to differing extents, for the selection, maintenance and monitoring of the Plan's investment options, including the option of Company Stock.

102.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that assets within the plan are prudently invested.  The Defendants were responsible for ensuring that all investments in the Home Depot Stock fund in the Plan were prudent and are liable for losses incurred as a result of such investments being imprudent.

103.    Moreover, a fiduciary's duty of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should know would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. §

31

1104(a)(l)(D). Thus, a fiduciary may not blindly follow Plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor allow others, including those whom they direct or who are directed by the plan to do so.

104.    The Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, these Defendants knew or should have known that Home Depot Stock was not a suitable and appropriate investment for the Plan as described herein for either (i) Home Depot Stock purchased through participant contributions to the Plan or (ii) Home Depot Stock accumulated by the Plan through Company matching contributions.    Nonetheless, during the Class Period, these fiduciaries continued to offer the Home Depot Stock as an investment option for the Plan and to direct and approve Plan investment in Home Depot Stock, instead of in cash or other investments. Moreover, during the Class Period, despite their knowledge of the imprudence of the investment, Defendant failed to take adequate steps to prevent the Plan, and indirectly the Plan Participants and beneficiaries, from suffering losses as a result of the Plan's investment in Home Depot Stock.

105.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and to resolve them promptly when they occur.    A fiduciary must always administer a plan with single-minded devotion to the interests of the Participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

106.    The Defendants also breached their co-fiduciary obligations by, among other failures, knowingly participating in, making no effort to remedy, and/or knowingly undertaking to conceal, their fellow Defendants' failure to prudently and loyally manage Plan assets in the exercise of their

discretion with respect to the offering Company Stock as an investment option in the Plan despite knowing that such failures were breaches of their ERISA mandated fiduciary duties.

107.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

108.    Pursuant to ERISA § 502(a), 29U S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT II

### FAILURE TO MONITOR AND TO PROVIDE ACCURATE INFORMATION (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 BY HOME DEPOT AND DEFENDANTS)

109.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

110.    At all relevant times, as alleged above, Home Depot and Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 20 U.S.C. § 1002(21)(A).

111.    At all relevant times, as alleged above, the scope of the fiduciary responsibility of Home Depot and Defendants included the responsibility to monitor other fiduciaries.

112.    The duty to monitor entails both giving information to and reviewing the actions of the monitored fiduciaries. In this case, that meant that the monitoring fiduciary, Home Depot and Defendants, had the duty to:

(a)    Ensure that the monitored fiduciaries possessed  the needed credentials and

experience, or use qualified advisors and service providers to fulfill their duties. They must be knowledgeable about the operations of the Plan, the goals of the Plan, and the behavior of Plan Participants;

(b)     Ensure that the monitored fiduciaries had ready access to such outside, impartial advisors, counsel, and experts when needed;

(c)     Ensure that the monitored fiduciaries were provided with adequate financial resources to do their job;

(d)     Ensure that the monitored fiduciaries had adequate information and to do their job of overseeing the Plan investments;

(e)     Ensure that the monitored fiduciaries maintained adequate records of the information on which they based their decisions and analysis with respect to Plan investment options; and

(f)     Ensure that the monitored fiduciaries reported regularly to the Company. The Company must then review, understand, and approve the conduct of the hands-on fiduciaries.

113.    Under ERISA, a monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment of plan assets, and must take prompt and effective action to protect the plan and participants when they are not. The duty to monitor encompasses a duty to periodically monitor the performance of the appointees so as to ensure compliance with their fiduciary duties under ERISA and the Plan.

114.    The duty of prudence requires that appointing fiduciaries have procedures in place so that on an ongoing basis they may review and evaluate whether investment fiduciaries are doing an adequate job (for example, by requiring periodic reports on their work and the Plan's

performance, and by ensuring that they have a prudent process for obtaining the information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for prudently concluding that their appointees were faithfully and effectively performing their obligations to Plan Participants or for deciding whether to retain or remove them.

115.   Furthermore, a monitoring fiduciary must provide the monitored fiduciaries with complete and accurate information in their possession that they know or reasonably should know that the monitored fiduciaries must have in order to prudently manage the plan and the plan assets.

116.   Home Depot and Defendants breached their fiduciary monitoring duties by, among other things, (i) failing to ensure that the monitored fiduciaries had access to knowledge about the Company's business improprieties alleged above, which made Company Stock an imprudent retirement investment, and (ii) failing to ensure that the monitored fiduciaries appreciated the huge risk inherent in the significant investment by rank and file employees in an undiversified employer stock fund. Home Depot and Defendants knew or should have known that the fiduciaries it was responsible for monitoring were imprudently allowing the Plan to continue offering the Home Depot Stock as a Plan investment, and continuing to invest in Home Depot Stock when it no longer was prudent to do so, yet failed to take action to protect the Participants from the consequences of these fiduciaries' failures.

117.   In addition, as a result of its inappropriate practices and implicit knowledge thereof, Home Depot and Defendants, in connection with their monitoring and oversight duties, were required to disclose to the monitored fiduciaries accurate information about the financial condition and practices of Home Depot that it knew or should have known that these Defendants needed to

35

make sufficiently informed decisions.  By remaining silent and continuing to conceal such information from the other fiduciaries, Defendants breached their monitoring duties under the Plan and ERISA.

118.    Home Depot and Defendants are liable as a co-fiduciaries because: (i) they knowingly participated in the fiduciary breaches by their fellow Defendant-fiduciaries in the activities implicated in this Count; (ii) they enabled the breaches by these Defendants; and (iii) they had knowledge of these breaches yet failed to make any effort to remedy them.

119.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

120.    Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## COUNT III

### FAILURE TO PROVIDE COMPLETE AND ACCURATE INFORMATION TO PLAN PARTICIPANTS AND BENEFICIARIES (BREACHES OF FIDUCIARY DUTIES IN VIOLATION OF ERISA § 404 AND 405 OF ERISA)

121.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

122.    At all relevant times, as alleged above, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

123.    At all relevant times, the scope of the fiduciary responsibility of the Defendants included Plan communications and material disclosures.

36

124.     The duty of loyalty under ERISA requires fiduciaries to speak truthfully to Participants, not to mislead them regarding the plan or plan assets, and to disclose information that Participants need in order to exercise their rights and interests under the plan.  This duty to inform Participants includes an obligation to provide Participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing false information or concealing material information regarding Plan investment options, such that Participants can make informed decisions with regard to the prudence of investing in such options made available under the Plan. This duty applies to all Plan investment options, including investment in Home Depot Stock.

125.     Because investment in the Plan was not diversified (*i.e.*, the Defendants chose to invest the Plan's assets, and/or allow those assets to be invested, so heavily in Home Depot Stock), such investment carried with it an inherently high degree of risk.  This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Home Depot Stock.

126.     The Defendants breached their duty to inform Participants by failing to provide complete and accurate information regarding Home Depot Stock.  Home Depot's business improprieties, public misrepresentations and inflated earnings, and the consequent artificial inflation of the value of Home Depot Stock and, generally, by conveying inaccurate information regarding the soundness of Home Depot Stock and the prudence of investing retirement contributions in Home Depot equity.  These failures were particularly devastating to the Plan and the Participants and thus, losses in this investment had an enormous impact on the value of Participants' retirement assets.

127.     Defendants in this Count are also liable as co-fiduciaries because (i) they knowingly participated in and knowingly undertook to conceal the failure of the other fiduciaries to provide

37

complete and accurate information regarding Home Depot Stock, despite knowing of their breaches; (ii) they enabled such conduct as a result of their own failure to satisfy their fiduciary duties; and (iii) they had knowledge of the other fiduciaries' failures to satisfy their duty to provide only complete and accurate information to Participants, yet did not make any effort to remedy the breaches.

128.   Where a breach of fiduciary duty consists of, or includes, misrepresentations and omissions material to a decision by a reasonable Plan Participant that results in harm to the Participant, the participant is presumed as a matter of law to have relied upon such misrepresentations and omissions to his or her detriment. Here, the above-described statements, acts and omissions of the Defendants in this Complaint constituted misrepresentations and omissions that were fundamentally deceptive concerning the prudence of investments in Home Depot Stock and were material to any reasonable person's decision about whether or not to invest or maintain any part of their invested Plan assets in Home Depot Stock during the Class Period. Plaintiff and the other Class members are therefore presumed to have relied to their detriment on the misleading statements, acts, and omissions of the Defendants as described herein.

129.   Defendants in this Count were unjustly enriched by the fiduciary breaches described in this Count.

130.   As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiff and the Plan's other Participants and beneficiaries, lost a significant portion of their retirement investment.

131.   Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants in this Count are liable to restore the losses to the Plan caused by their breaches of fiduciary duties alleged in this Count.

## REMEDY FOR BREACHES OF FIDUCIARY DUTY

132.     The Defendants breached their fiduciary duties in that they knew or should have known the facts as alleged above, and therefore knew or should have known that the Plan's assets should not have been so heavily invested in Company stock.

133.     Each Defendant is jointly liable for the acts of the other Defendants as a co-fiduciary.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for:

A.     Declaration that the Defendants, and each of them, have breached their ERISA fiduciary duties to the Participants;

B.     An Order compelling the Defendants to make good to the Plan all harm suffered by the Plan resulting from Defendants' breaches of their fiduciary duties, including any dimunition of the Plan's vested assets resulting from imprudent investment of the Plan's vested assets, and to restore to the Plan all profits the Defendants made through use of the Plan's vested assets, and to restore to the Plan the full amount of vested assets which the Plan should have had if the Defendants had fulfilled their fiduciary obligations and to distribute those vested assets to the Participants' individual accounts as required by law;

C.     Imposition of a Constructive Trust on any amounts by which any Defendant was unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

D.     An Order enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

G.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

H.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the

common fund doctrine; and

        I.      An Order for equitable restitution and such other and further relief against the

Defendants which the court deems just and proper.

Dated: October 2, 2006

                           **GAINEY & McKENNA**

                           *Thomas J. M⁻Kenna*

                           Thomas J. McKenna (TJM-7109)
                           295 Madison Avenue, 4th Floor
                           New York, New York 10017
                           Tel: (212) 983-1300
                           Fax: (212) 983-0383

                           **Attorneys for Plaintiff**